312 F.3d 984
 UNITED STATES of America, Plaintiff-Appellee,
v.
Raul FRANCO-LOPEZ, Defendant-Appellant.
 No. 00-50422.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 2002.
 Filed November 27, 2002.
 
 James B. Rudolph, David Songco, San Diego, CA, for the defendant-appellant.
 Renée M. Bunker, Assistant United States Attorney, and Jill L. Burkhardt, Assistant United States Attorney, Appellate Section, Criminal Division, San Diego, CA, for the plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of California; William B. Enright, District Judge, Presiding. D.C. No. CR-99-03093-WBE.
 Before WARDLAW and BERZON, Circuit Judges, and ISHII,* District Judge.
 OPINION
 BERZON, Circuit Judge.
 
 
 1
 Pursuant to a plea agreement, Raul Gilberto Franco-Lopez pled guilty to the crime of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He contends that the government violated the plea agreement and that he is entitled to specific performance of that agreement.
 
 
 2
 We hold that the government indeed breached the plea agreement, but that the appropriate remedy for that breach, if any, can only be determined after further proceedings upon remand.
 
 BACKGROUND
 
 3
 In December 1998, undercover officers began investigating Franco-Lopez's suspected role in smuggling drugs across the United States-Mexico border. The following year Franco-Lopez engaged in numerous discussions with his co-defendant Martiniano Pena-Pena ("Pena-Pena") and a confidential informant ("informant") about smuggling narcotics into the United States. Franco-Lopez offered to introduce the informant to drug smugglers operating out of Tijuana, Mexico, gave the informant reason to believe he had a supply of illegal narcotics in the United States, and presented himself as a key contact between the participants in a smuggling operation.
 
 
 4
 On August 21, 1999, Franco-Lopez and Pena-Pena provided the informant with $1,000 to pay a "corrupt inspector" who would allow the men to import a load of marijuana into the United States. Three days later, Franco-Lopez and the informant waited near the Otay Mesa, California, Port of Entry for a van that Franco-Lopez knew was to contain marijuana. After the van arrived, the informant drove it through the port of entry via the assertedly corrupt inspector's booth. The informant then met Franco-Lopez and Pena-Pena at a predesignated drop-off point, where the two co-defendants gave $20,000 to the informant.
 
 
 5
 Franco-Lopez was arrested in September 1999 for trafficking in narcotics across the United States-Mexico border. He entered into a plea agreement in which he admitted that on or before August 24, 1999, he knowingly possessed, or aided and abetted the possession of, marijuana with the intent to distribute.
 
 
 6
 Three sections of that plea agreement are at issue in this appeal. They are: (1) a promise to recommend a sentence below the mandatory minimum under the U.S.S.G. § 5C1.2 "safety valve" provision[1] "if the United States Probation Department finds the defendant meets the requirements of that section and if the United States Attorney finds that defendant has truthfully disclosed to the Government all information and evidence concerning the offense that were part of the defendant's course of conduct;" (2) a provision preserving to both parties the right to "recommend and argue for adjustments and departures not set forth" in the plea agreement; and (3) an agreement on the part of the government to "forego recommending inclusion of facts for relevant conduct purposes, any loads of marijuana that Defendant and his Co-Defendant facilitated the importation of subsequent to the August 24, 1999, 890—pound load ...." [sic].
 
 
 7
 After securing this plea agreement, the government provided information, including information detailing offenses subsequent to the August 24 offense, to the probation officer responsible for preparing the Presentence Report (PSR). The government also represented to the probation officer that "the defendant was an organizer of marijuana smuggling ventures" and recommended that Franco-Lopez was eligible for an aggravated role adjustment under U.S.S.G. § 3B1.1, a position inconsistent with eligibility for the safety valve. See U.S.S.G. § 5C1.2 (4).
 
 
 8
 The PSR, using the information provided by the government, recommended a base offense level of 32, reflecting marijuana smuggled not only on or before August 24, 1999 but also on three subsequent occasions in September. See U.S.S.G. § 1B1.3(a)(2). Additionally, the PSR, relying on the government's characterization of the defendant as "an organizer of marijuana smuggling ventures," recommended against application of the safety valve.
 
 
 9
 Following the filing of the PSR, the government filed its own motion for role enhancement and argued for a role enhancement at the sentencing hearing. When asked at the hearing whether it had done so because of the probation office's recommendation, the government said that was not the case. Instead, the government represented that, "[f]rom the get-go, role was going to be an issue. So we agreed to leave that wide open .... Unfortunately, that's not in writing in some formal letter .... but the role enhancement was contemplated from the start...." The government did not, however, recommend the 32-level base offense urged by the PSR but instead, as promised, argued for a base offense level reflecting only the August 24 offense.
 
 
 10
 At the sentencing hearing, Franco-Lopez claimed that the government had breached the plea agreement both by providing information to the probation department on the smuggling transactions after August 24 and by maintaining that Franco-Lopez was an organizer of the August 24 smuggling transaction and therefore not entitled to the safety valve. The district court found that there had been no breach of the agreement and went on to deny Franco-Lopez the safety valve departure on two grounds: first, that Franco-Lopez was an organizer in the offense; and second, that Franco Lopez had failed to truthfully disclose the information required by U.S.S.G. § 5C1.2.
 
 
 11
 As to the safety valve, the district court held that the plea agreement was not breached because the agreement permitted the government to seek a role adjustment, even though an aggravated role adjustment would necessarily be inconsistent with the safety valve. While holding that the government "acted in good faith and properly," the district court expressed significant qualms, noting at the hearing:
 
 
 12
 I would have been much more comfortable with this result if the probation office's evaluation of the safety valve qualification as an organizer had been made initially which triggered the government's position that since it was left in the plea agreement to the auspices of the probation office as to whether or not there was a qualification .... To that extent it was never a good crack of the defendant at the safety valve consideration.
 
 
 13
 In its written opinion, the district court again held that "[t]he organizer adjustment falls squarely in the rights reserved provision [and] .... [t]he government did not promise to remain silent on defendant's compliance with the safety valve factors." Once more, the court expressed its "concern[]" that the government's safety valve promise was illusory in that from the outset the government possessed the factual basis to determine that defendant was an organizer in the August 1999 load and therefore ineligible for the "safety valve," but noted that the "lack of candor at the debriefing ... is an independent basis."
 
 
 14
 As to the disclosure prong, the government stated generally that in his debriefing Franco-Lopez had minimized his role but did not point to any particular untruthful statement. Defense counsel objected that
 
 
 15
 with respect to the truthfulness value — that is the defense's burden to prove, except my hands have been tied since the beginning, because I have not been able to check on the accuracy ... [The government], aside from saying he minimized his role, has not [identified] what lies he told so I can refute that.
 
 
 16
 The district court concluded that the "[d]efendant failed to satisfy that condition." The court made no specific findings regarding any respect in which Franco-Lopez was not truthful, stating that he did not want to "open a Pandora's box" or have a "full-blown trial" with regard to "w[h]ether the defendant is truthful in this debriefing."[2] Franco-Lopez was sentenced to the mandatory minimum term applicable absent the applicability of the safety valve — sixty months in prison and five years of supervised release. He now appeals, contending that the plea agreement was breached and should be specifically enforced.
 
 DISCUSSION
 
 17
 As we have previously recognized, our standard of review for a district court's determination concerning an alleged breach of a plea agreement has been "inconsistent." United States v. Johnson, 187 F.3d 1129, 1134 (9th Cir.1999); compare United States v. Schuman, 127 F.3d 815, 817 (9th Cir.1997) (de novo standard of review) with United States v. Salemo, 81 F.3d 1453, 1460 (9th Cir.1996) (review of the district court's interpretation of the terms of the plea agreement is de novo, while the consideration of "whether the facts demonstrate that there was a breach of a plea agreement" is reviewed under the "more deferential clearly erroneous standard of review"). We need not resolve the inconsistency in this case. Whichever standard we apply, we reach the same conclusion: The government breached the plea agreement by rendering its promise to support a safety valve departure, conditioned on the PSR's recommendation, illusory, but did not otherwise breach the agreement.
 
 
 18
 Plea agreements are contractual by nature and are measured by contract law standards. United States v. Trapp, 257 F.3d 1053, 1056 (9th Cir.2001). The courts enforce the literal terms of the plea agreement, Johnson, 187 F.3d at 1134, but "construe ambiguities in favor of the defendant," United States v. Quach, 302 F.3d 1096, 1100-01 (9th Cir.2002), ordinarily placing on the government "responsibility for any lack of clarity," United States v. Anderson, 970 F.2d 602, 607 (9th Cir.1992), as amended 990 F.2d 1163 (9th Cir.1993). In construing the agreement we must determine what Franco-Lopez reasonably believed to be the terms of the plea agreement at the time of the plea. Id.
 
 
 19
 Generally, a defendant is entitled to the benefit of his or her plea bargain. Sentencing pursuant to a plea bargain
 
 
 20
 must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.
 
 
 21
 Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Accordingly, a plea bargain may be enforced through specific performance, see id. at 263, 92 S.Ct. 495; Anderson, 970 F.2d at 608 n. 8, or the defendant may be permitted to withdraw her guilty plea. See Santobello, 404 U.S. at 263, 92 S.Ct. 495; Johnson, 187 F.3d at 1136. Our interpretation of the plea agreement between Franco-Lopez and the government, then, must secure the benefits promised Franco-Lopez by the government in exchange for surrendering his right to trial.
 
 A. Role Enhancement
 
 22
 The plea agreement stipulated that the government would recommend application of the safety-valve departure if:
 
 
 23
 the United States Probation department finds that the Defendant meets the requirements of that section, and if the United States Attorney finds that the Defendant has truthfully disclosed to the Government all information and evidence concerning offenses that were part of Defendant's course of conduct.
 
 
 24
 To qualify for the safety valve a defendant must meet five criteria. One of those criteria prohibits application of the departure if the defendant was an organizer, leader, manager, or supervisor of others in the offense or was involved in a continuing criminal enterprise. U.S.S.G. § 5C1.2(4). A recommendation for role enhancement under U.S.S.G. § 3B1.1 is, therefore, necessarily inconsistent with a recommendation for the application of the safety valve departure.[3]
 
 1. The Agreement
 
 25
 Looking at the plea agreement as a whole, we conclude that Franco-Lopez, when he pleaded guilty, would have understood that the government was agreeing to maintain neutrality in dealing with the Probation Office with respect to matters that would potentially affect the PSR's safety valve determination, including whether Franco-Lopez was an organizer of the criminal activity.
 
 
 26
 The plea agreement divides responsibility for determining eligibility for the safety valve between the Probation Department and the United States Attorney, providing the latter a role only with respect to assessing truthful disclosure. There would be little point in binding the United States to recommend the safety valve "if the .... Probation Department finds that the Defendant meets the requirements of that section" (emphasis added) unless the PSR's finding was to be an independent one, based on the Probation Department's assessment of the facts rather than the government's analyses and recommendations. Absent such an understanding, the government would be agreeing to carry out the Probation Department's findings but could then essentially dictate those findings by its own characterization of Franco-Lopez's role. To so read the agreement would be to give insufficient effect to the different roles assigned to the Probation Department and the prosecution.
 
 
 27
 In contrast, reading the agreement as providing for an independent assessment in the PSR of safety valve factors, including role enhancement, would give force to both the conditional promise to support the application of the safety valve and to the language preserving the parties' right "to recommend and argue for additional adjustments and departures not set forth in Section XI(A)." Because upward role adjustment is an aspect of the safety valve evaluation, the two provisions, taken together, do permit the government to argue for a role enhancement — if the PSR first finds such an enhancement appropriate, but not otherwise.
 
 
 28
 Supporting this understanding is the limitation on the parties' "right to recommend additional adjustments" — namely, that those adjustments be ones that are "not set forth above in Section XI(A)." Section XI(A) provides that "the Government will make the following sentencing recommendations: .... 3. Safety Valve (if applicable)." (Emphasis added). At the very least, "if applicable" (emphasis added) indicates that the promise is contingent upon an assessment not yet made at the time of the plea agreement. That assessment, as provided in the immediately ensuing provision of the plea agreement, section XI(B), was to be made by the United States Probation Department, not the prosecution. Reading the agreement in this way gives meaning to the government's conditional agreement to recommend the safety valve.
 
 
 29
 Accordingly, there is no contradiction between the broad permission to the parties to seek adjustments and a limitation on the government to recommend a role enhancement only if the Probation Department independently concludes that such an enhancement is proper. Rather, the broad permission is itself limited by the cross-reference to section XI(A), and section XI(B) illuminates the meaning of section XI(A).
 
 
 30
 In thus reading the agreement as a whole so as to avoid an illusory promise, we are informed by Dillon v. United States, 307 F.2d 445 (9th Cir.1962). In Dillon, the Assistant United States Attorney (AUSA) argued that under the terms of an agreed-upon plea bargain he was to recommend a specific sentence only if the district court judge asked him for such a recommendation. Id. at 449. The district judge noted that such a condition would have been "strange" because it was not his practice to ask for sentence recommendations. Id. The district judge further noted that it was a fair assumption that the AUSA knew the identity of the sentencing judge and was familiar with that judge's practices regarding sentence recommendation requests. Id. We concluded that if the AUSA did have this knowledge, the representation that a recommendation would be given "if asked" could be illusory, and the inducement to enter a guilty plea based on such an illusory promise would be a violation of due process. Id.
 
 
 31
 In construing a plea agreement, as in construing any contract, we favor a construction under which the agreement is legally valid over an interpretation that would require voiding the agreement. See Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") So, to avoid the result suggested in Dillon — voiding the plea agreement if the government promise that induced it is on analysis illusory — we prefer a contractual interpretation that gives some effect to the government's apparent promises contained in the agreement, rather than rendering those promises illusory.
 
 
 32
 For all these reasons, we conclude that the government chose to enter into an agreement structured so that the government's recommendation of a safety valve departure was to be based on the independent findings of the Probation Department with regard to all the safety valve factors other than the truthful disclosures requirement (as to which the agreement specifically assigns responsibility to the United States Attorney).
 
 2. Breach of the Agreement
 
 33
 Under our reading of the plea agreement, the government's conduct amounted to a breach for two reasons: (1) The government both informed the Probation Department that Franco-Lopez "was an organizer of marijuana smuggling ventures" and affirmatively recommended to the Department that "role enhancements were considered appropriate." By doing so, the government violated the neutral stance it was required to take when dealing with issues that could affect the PSR's safety valve determination. (2) The government's subsequent motion for role enhancement was tainted by the fact that it had recommended that the PSR find an enhanced role. Indeed, the record shows that the government may well have entered the plea agreement with the intention of recommending an enhanced role.[4]
 
 
 34
 Whether the latter is true or not, the government's characterization and role enhancement recommendation resulted in a PSR that recommended against application of the safety valve. The government then, in turn, relied on the PSR as a basis for its own negative safety valve recommendation to the district judge. This recommendation breached the plea agreement by rendering the "if applicable" condition and the allocation of responsibility for determination of the existence of that condition to the Probation Department both illusory.
 
 
 35
 We conclude that the government, whether in good faith or bad,[5] breached the plea agreement by recommending against the safety valve without an independent finding by the Probation Department that the safety valve was not applicable because Franco-Lopez was eligible for an "organizer" role enhancement.
 
 B. Relevant Conduct
 
 36
 Franco-Lopez argues that the government also breached the plea agreement by providing documents and information to the probation officer which supported a higher base offense level and a finding of aggravated role. Providing this information, Franco-Lopez maintains, violated the government's promise to forego recommending reliance on post-August 24 smuggling activity for relevant conduct purposes.
 
 
 37
 We note at the outset that the government did not urge the district court to consider information about Franco-Lopez's criminal activity after August 24, 1999 as "relevant conduct." Instead, the prosecution at the sentencing hearing disagreed with the PSR's calculation of a base offense level of 32 based on consideration of the post-August 24 drug smuggling activity and encouraged the court not to consider such information. Moreover, the district court followed the lower base offense level recommended by the government and accordingly sentenced Franco Lopez to the mandatory minimum sentence rather than to the much higher sentence the PSR recommended. We nonetheless address the question whether the government improperly provided information to the Probation Department concerning the post-August 24 activity, because, as the district court noted, the inclusion of the information in the PSR could have an impact on Franco-Lopez's treatment while in prison.
 
 
 38
 The provision of information detailing Franco-Lopez's subsequent offenses to the probation officer is not tantamount to a recommendation by the government that such information be used for relevant conduct purposes. This court has construed the word "recommendation" in plea agreements as indicating prosecutorial preference, and as requiring that the prosecutor not "contradict his recommendation with statements indicating a preference for a harsher sentence." Johnson, 187 F.3d at 1135; see also United States v. Grimm, 170 F.3d 760, 765-66 (7th Cir.1999) (noting that the government could make a meaningful recommendation to the court despite presenting information which conflicted with the position it was required by the plea agreement to take).
 
 
 39
 We also note that an agreement to keep relevant sentencing information from the district court might conflict with the government's duty of candor to the sentencing court. See United States v. Maldonado, 215 F.3d 1046, 1052 (9th Cir.2000) ("[D]espite a plea agreement to make certain recommendations, the government has a duty to ensure that the court has complete and accurate information, enabling the court to impose an appropriate sentence."), cert. denied, 531 U.S. 1172, 121 S.Ct. 1141, 148 L.Ed.2d 1004 (2001); see also Anderson, 970 F.2d at 608 (noting that a plea agreement that limited the provision of information to the probation officer and district court might conflict with the duty of disclosure, and also noting the government is ethically bound to avoid entering plea agreements that it cannot keep); United States v. Williamsburg Check Cashing Corp., 905 F.2d 25, 28 (2d Cir. 1990) ("[A] plea agreement cannot be interpreted to preclude all government sources, including case agents, from providing the Probation Department with factual information regarding appellants .... Such an agreement to keep the judge ignorant of pertinent information cannot be enforceable ....")
 
 
 40
 We conclude that the government did not breach the plea agreement by providing information to the Probation Department regarding Franco-Lopez's criminal activity while recommending successfully to the district court that it not rely on that information in sentencing.
 
 C. Truthful Disclosure
 
 41
 The district court found that the safety valve departure could not be applied to Franco-Lopez's sentence because, aside from acting as an organizer, Franco-Lopez had failed truthfully to disclose his involvement in the offense in accordance with U.S.S.G. § 5C1.2(5).[6] Under § 5C1.2, a defendant must prove by a preponderance of the evidence that she qualifies for the safety valve provision. United States v. Ajugwo, 82 F.3d 925, 929 (9th Cir.1996). We review for clear error the district court's factual determination that a particular defendant is eligible for relief under § 5C1.2. United States v. Real-Hernandez, 90 F.3d 356, 360 (9th Cir.1996). The district court must "provide reasons for agreeing or refusing to apply section 5C1.2 at the time of sentencing." Id.
 
 
 42
 The district court found that Franco-Lopez was not entitled to receive the safety valve because "the defendant did not meet the fifth prong by his own lack of candor at the debriefing." The district court did not, however, provide any reasons at all to support this finding, either at the sentencing hearing or in its final opinion. Instead, the district court stated a preference to avoid the opening of a "Pandora's box" and expressed reluctance to get into a "full-blown trial" on the issue.
 
 
 43
 Further, the record contains no indication of what Franco-Lopez actually said in his debriefing, so neither we nor the district court are in any position to judge his truthfulness. Without either a pertinent record or reasoning from the district court on this question, we cannot perform "meaningful appellate review" of the decision to deny Franco-Lopez the safety valve on the alternate ground that he did not satisfy the truthful disclosure requirement. See id. at 360. The denial of the safety valve therefore cannot at this juncture rest on this alternate ground.
 
 
 44
 On remand, the district court should first make further findings as to whether Franco-Lopez met the truthful disclosure requirement of § 5C1.2. The court may, but need not, provide the parties with an opportunity for an evidentiary hearing. Id. at 362 ("There is no general right to an evidentiary hearing at sentencing... and the district court has discretion to determine whether to hold such a hearing." (internal citations omitted)). The court must, however, assure that Franco-Lopez is provided with fair notice of the respects in which the government maintains that he has not been truthful and allow him to provide contrary evidence, if he has any. See id. ("Where a fact relevant to sentencing is disputed, the district court must provide the parties a reasonable opportunity to present information to the court." (internal quotation marks omitted)).
 
 
 45
 If the district court determines that Franco-Lopez has not met the truthful disclosure criteria, he is ineligible for the safety valve departure. If, however, the court finds that Franco-Lopez fulfills his burden of demonstrating that he has met all the requirements of U.S.S.G. § 5C1.2, the district court will have to consider how best to assure that Franco-Lopez receives the full benefit of his bargain with the government.
 
 
 46
 On the one hand, Franco-Lopez was assured only that the government would recommend the safety value if the Probation Department found him eligible. On the other hand, it would be difficult at this juncture to unring the bell. The government did provide its analysis and recommendation on the aggravated role enhancement to the Probation Department, that analysis and recommendation did influence the Probation Department's recommendation, and the government's recommendation to the district court regarding role enhancement was based on its own analysis of Franco-Lopez's eligibility for that enhancement, reached in whole or part before the PSR was written. Under these circumstances, one way to restore to Franco-Lopez the benefit of his bargain may be to commission an entirely new PSR by a different probation officer. We leave to the district court to decide whether that remedy or some other is appropriate.
 
 
 47
 If the district court ultimately concludes that Franco-Lopez is eligible for the safety valve, then the district court has no discretion to withhold its application. "This ... does not require the court to sentence a defendant to a term less than the mandatory minimum; but it does require the court to sentence the defendant without regard to any statutory minimum." Id. at 361-62 (internal quotation marks omitted).
 
 CONCLUSION
 
 48
 Because the government breached the plea agreement, we vacate Franco-Lopez's sentence and remand to a different judge for resentencing in accordance with this opinion. Johnson, 187 F.3d at 1136 n. 7.[7]
 
 
 49
 VACATED AND REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Anthony Ishii, United States District Judge for the Eastern District of California, sitting by designation
 
 
 [1]
 The safety valve provision provides that a court shall sentence without regard to any mandatory minimum sentence
 .... if the court finds that the defendant meets the [following] criteria ...:
 (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
 (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
 (3) the offense did not result in death or serious bodily injury to any person;
 (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and
 (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
 U.S.S.G. § 5C1.2 (1999).
 
 
 [2]
 The record does not indicate that Franco-Lopez's defense counsel ever had a chance to examine and challenge any specific alleged untruthful statements made by Franco-Lopez in his debriefing
 
 
 [3]
 U.S.S.G. § 3B1.1 provides:
 Based on the defendant's role in the offense, increase the offense level as follows:
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 [4]
 At the sentencing hearing the district court inquired of the government's counsel whether the PSR had "triggered" the government's position on role enhancement. The government responded that its position was not triggered by the PSR, but that:
 [a]s the facts clearly indicate, both of these guys were major players ... and were clearly movers and shakers in organizing this 890 pound first load. And so from the get-go, role was going to be an issue. So we agreed to leave that wide open ... the role enhancement was contemplated from the start and had nothing to with the probation's recommendation.
 
 
 [5]
 We note that, as in any other breach of contract situation, to say that one party breached the contract is not to ascribe to that party bad faith. It is precisely because the parties to a contract do not always agree about the contract's meaning that courts are enlisted in interpreting them. That we invariably end up disagreeing with one party's interpretation or the other's is not to ascribe a failure to act in good faith to the party with whom we disagree
 
 
 [6]
 Franco-Lopez's opening brief does not challenge the district court's finding that he did not truthfully disclose his involvement in the offense as required by § 5C1.2(5). The government, however, raised the truthful disclosure issue in its brief. This court may consider claims not raised by appellant's opening brief but raised by the appellee's briefSee United States v. Peninsula Communications, Inc., 287 F.3d 832, 839 (9th Cir.2002); see also Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir.1990) (noting that although it is a well-established Ninth Circuit rule that appellant cannot raise a new issue for the first time in her reply brief, the court may consider the issue if the appellee raised it in her brief). We do so here.
 
 
 [7]
 In directing resentencing by a different judge, we do not intend any criticism of the district judge, who recognized that the question whether the government had breached the plea agreement was a close one. Rather, the case law uniformly requires sentencing by a different judge where the government has breached its plea agreement